UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


KAREN K. COPE,                          )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )        No.  4:13CV670 TIA
                                        )
CAROLYN W. COLVIN, Acting               )
Commissioner of Social Security,        )
                                        )
                    Defendant.          )


## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Karen K. Cope's application for disability

insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et*

*seq.*  All matters are pending before the undersigned United States Magistrate

Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).  Because the

Commissioner's final decision is supported by substantial evidence on the record

as a whole, it is affirmed.

### I.  Procedural History

On March 31, 2010, plaintiff Karen K. Cope applied for disability insurance

benefits (DIB) claiming she became disabled on June 13, 2006, because of visual

impairments due to stroke, attention deficit hyperactivity disorder (ADHD),

anxiety, diabetes, and celiac disease. (Tr. 128-34, 151.) Upon initial consideration, the Social Security Administration denied plaintiff's claim for benefits. (Tr. 76, 77-81.) Upon plaintiff's request, a hearing was held before an administrative law judge (ALJ) on November 17, 2011, at which plaintiff and a vocational expert testified. (Tr. 25-68.) On March 26, 2012, the ALJ issued a decision denying plaintiff's claim for benefits, finding vocational expert testimony to support a finding that plaintiff can perform work as it exists in significant numbers in the national economy. (Tr. 7-21.) On February 4, 2013, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-6.) The ALJ's decision thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

In the instant action for judicial review, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole, arguing that the ALJ erred in determining her residual functional capacity (RFC) by failing to include additional limitations caused by her arthritis and mental impairments, and by improperly discounting the opinions of her treating and consulting physicians. Plaintiff also contends that the ALJ should have ordered a mental consultative examination. Plaintiff also argues that the ALJ erred in determining her complaints not to be credible. Plaintiff requests that the final decision be reversed and the matter be remanded for an award of benefits or for further

consideration. For the following reasons, the ALJ did not err in her determination.

## II. Testimonial Evidence Before the ALJ

A.  <u>Plaintiff's Testimony</u>

At the hearing on November 17, 2011, plaintiff testified in response to questions posed by the ALJ and counsel.

Plaintiff last worked on June 13, 2006, as a customer service supervisor at a call center for a medical equipment distributor. Plaintiff held this position since 2004. Previous employment positions held by plaintiff include work as a dietary assistant in a hospital from 1988 to 2003; as an inventory clerk/biller at Durable Medical Goods Co. for nine months in 2003; and as a biller clerk for a medical equipment distributor from September 2003 to 2004. (Tr. 172.) Plaintiff testified that she also attended college for a period of time but did not obtain a degree. (Tr. 53.)

Plaintiff testified that she is unable to work because of residual effects from a stroke. Plaintiff testified that she had had some strokes from which she recovered but currently experiences visual problems from a third stroke that she had in 2005. (Tr. 33-34, 38.) Plaintiff testified that she is limited with driving and has problems looking at paperwork or a computer because of difficulties with focus. Plaintiff testified that she must rest her eyes after about five to ten minutes of concentrating on detailed work. Plaintiff testified that she also has dry eyes and

limited peripheral vision.  (Tr. 38-39.)

Plaintiff also testified that she cannot work because of problems she has getting along with other people.  Plaintiff testified that she had many outbursts while working and that she "did not stay within [her] boundaries at times." Plaintiff testified that working under deadlines and within guidelines created a lot of stress and anxiety and that she would become angry and make inappropriate remarks during such times.  (Tr. 46-47.)  Plaintiff testified that she also had difficulty with supervisors.  Plaintiff testified that she takes medication for anxiety and panic attacks, which helps, and that her anxiety has improved since she stopped working.  Plaintiff testified that she does not see a counselor for her mental condition because she is "not a talker."  (Tr. 39-40, 50.)

Plaintiff testified that she has arthritis in her low back, hands, knees, and feet.  Plaintiff testified that she sometimes feels it in her hips and that her entire body hurts at times.  (Tr. 37-38.)  Plaintiff testified that she experiences the most pain in her right foot, which causes pain when she walks.  Plaintiff takes only over-the-counter medication for the condition.  (Tr. 49-50.)

Plaintiff testified that she also has celiac disease and would suffer colitis-type symptoms if she did not follow a gluten-free diet.  Plaintiff also has hypertension and diabetes that are controlled with medication.  (Tr. 37, 45.)

As to her daily activities, plaintiff testified that she gets up at 4:30 a.m. and

prepares breakfast for herself and her mother.  Plaintiff then drives to a gym, which is about one mile away, and works out for thirty to forty-five minutes.  Plaintiff testified that she cleans up when she gets home and then prepares lunch.  Plaintiff testified that she cares for her mother, who is unable to walk without assistance because of painful arthritis.  Plaintiff prepares food for her mother and does her laundry.  Plaintiff also helps her mother with bathing and recently had to begin lifting her in order to assist her.  Plaintiff's mother weighs about 200 pounds.  Plaintiff testified that such lifting has strained her back and arms.  (Tr. 40-42.)  Plaintiff testified that she also helps a friend who has cancer by taking her to perform errands or helping with bills.  Plaintiff testified that she primarily provides moral support for her friend, which includes going to her friend's house to play pool with her son.  Plaintiff also runs errands for herself in town and cares for two cats.  (Tr. 42-43.)  Plaintiff testified that she relaxes after dinner.  Plaintiff sometimes watches television but usually falls asleep while doing so.  (Tr. 44.)

Plaintiff testified that she takes breaks from her activities during the day and usually rests for twenty to twenty-five minutes after about an hour of activity because her back and legs begin to hurt.  Plaintiff testified that she is most comfortable when she is reclining.  Plaintiff testified that she can read or work on the computer for about twenty to twenty-five minutes before she must stop, blink a bit, and stretch.  (Tr. 48-49.)

B.     Vocational Expert Testimony

Linda Tolley, a vocational rehabilitation consultant, testified at the hearing on November 17, 2011, in response to questions posed by the ALJ and counsel.

Ms. Tolley classified plaintiff's past relevant work as a dietary assistant as medium work with an SVP level of 7; as a billing clerk as sedentary with an SVP level of 4; as an inventory clerk as light with an SVP level of 5; as a customer service representative supervisor as sedentary with an SVP level of 6; and as a call center operator as light and at the semi-skilled or skilled level.  (Tr. 54-57.)

The ALJ asked Ms. Tolley to assume a younger individual at forty-six years of age[1] with no exertional limitations, but that the person should

> never climb ladders, ropes or scaffolds, avoid all exposure to moving
> machinery and unprotected heights for hazardous machinery.  Only
> occasional interaction with the public and occasional interaction with
> coworkers, which is basically casual and infrequent.  In other words,
> you can work near the coworkers but you don't work with them[.]

(Tr. 57-58.)  Ms. Tolley testified that such a person could perform plaintiff's past work as a billing clerk.  (Tr. 58.)  Ms. Tolley testified that such a person could also perform sedentary work as a data entry clerk, of which 5,500 such jobs exist in the State of Missouri and 240,000 nationally; and sedentary-to-light work as an office clerk, of which 15,000 such jobs exist in the State of Missouri and over one million nationally.  (Tr. 60-61.)  The ALJ asked Ms. Tolley to assume the individual could

---

[1] Plaintiff's birthdate is September 3, 1959.  As such, she was forty-six years of age on June 13,

have no contact with the public, to which Ms. Tolley responded that the previous jobs to which she just testified would not be precluded but the numbers would be reduced by about fifty-percent given the additional limitation. (Tr. 61-62.)

The ALJ then asked Ms. Tolley to assume the individual had difficulty with their vision such that she could not use computers or do a lot of paperwork because of eye strain. Ms. Tolley testified that such a person could not perform the work to which she had previously testified. (Tr. 62.) When asked to consider an individual who could engage in this type of work for no more than fifty percent of the time, Ms. Tolley testified that such a person could perform sedentary work as a small products assembler, of which 1,500 such jobs exist in the State of Missouri and 100,000 nationally; and eye drop assembler, of which less than 800 such jobs exist in the State of Missouri and 7,500 nationally. (Tr. 63-64.) Ms. Tolley testified that such positions would not be available to a person who was limited to performing fine fingering fifty percent of the time or less, and that such a limitation would eliminate most work. (Tr. 64-65.)

### III. Medical Records Before the ALJ

On October 3, 2005, Dr. Gary H. Myers, a neurologist, opined that plaintiff's recent episodes of diplopia, mild headache, and left hand weakness may be due to transient ischemic attacks (TIA). Plaintiff had been taking aspirin and

---

2006, the alleged onset date of disability.

was instructed to switch to Plavix.  (Tr. 241.)

Plaintiff contacted her primary care physician, Dr. Martha Reed, on December 1, 2005, with complaints of lost vision in her right eye, a "funny feeling" in her head, and feeling cold.  Plaintiff was anxious because of her previous history of stroke.  Dr. Reed instructed plaintiff to take aspirin and to rest for fifteen to thirty minutes.  (Tr. 254.)

On December 6, 2005, plaintiff underwent an MRI study of the brain in response to complaints of headaches and right eye blindness for six days.  Results of the MRI showed interval new left occipital infarct superimposing old ischemic changes.  (Tr. 230.)  Dr. Myers noted this MRI to show strokes bilaterally in the occipital lobes.  (Tr. 242.)

In a letter dated December 8, 2005, Dr. Mark H. Spurrier, an ophthalmologist, informed Dr. Reed that examination showed plaintiff's signs to indicate posterior visual pathways disease, and further evaluation was ordered. (Tr. 215, 236.)

Plaintiff visited Dr. John D. McGarry, a neurologist, on December 13, 2005, for evaluation involving her recent cerebrovascular accident (CVA).  Plaintiff was forty-six years of age.  Plaintiff was noted to be pleasant and cooperative.  Plaintiff reported having experienced vision loss, lightheadedness, left hand weakness, and vertigo within the previous three months.  Plaintiff had no complaints of

depression or anxiety. Plaintiff reported having frequent pain in her knees, hands, and neck and that she often experienced stiffness in the morning for about twenty minutes. Dr. McGarry noted plaintiff's current medications to be aspirin, Inderal, Nexium, Singulair, Paxil, Plavix, Reglan, and Pepcid. Physical examination showed plaintiff to have normal muscle power, tone, and coordination. Sensation and reflexes were intact. Gait was normal. Examination of the spine was normal. Neurological exam was remarkable for hemianopia[2] versus right visual inattention. No evidence of vasculopathy was noted. Plaintiff was instructed not to drive until released by a physician. It was noted that plaintiff may be referred to driving school for safety evaluation. (Tr. 231-34.)

On December 22, 2005, Dr. Spurrier diagnosed plaintiff with occipital stroke with some improvement in visual fields. (Tr. 214.)

Plaintiff returned to Dr. Myers on December 29, 2005, who noted plaintiff to have right hemianopia. No Babinski sign was noted. The remainder of her examination was within normal limits. Dr. Myers expressed concern regarding plaintiff's circulation problems. Dr. Myers instructed plaintiff to undergo transesophageal echocardiogram (TEE) testing, and a prescription was written for the test. It was noted that plaintiff took aspirin, Plavix, and folic acid; and Dr.

---

[2] Hemianopia is a blindness or reduction in vision in one half of the visual field due to damage of the optic pathways in the brain. *What is Hemianopia?,* Lighthouse Int'l (2014), *available at* <http://www.lighthouse.org/about-low-vision-blindness/vision-disorders/hemianopia/>.

Myers expressed hope that plaintiff's antiplatelet drugs would prevent additional strokes. (Tr. 242-43.)

On February 27, 2006, plaintiff reported to Dr. Reed that Dr. Myers permitted her to drive. It was noted that plaintiff's symptoms were under control, and she had no new complaints. Plaintiff reported that she was now a supervisor at American Home Patients, which she felt was a good fit for her. Plaintiff was continued on her current treatment regimen. (Tr. 254-55.)

Plaintiff returned to Dr. Spurrier on March 15, 2006, and reported no change to her peripheral vision. Plaintiff also reported having some trouble seeing to read. Upon examination, Dr. Spurrier diagnosed plaintiff with right homonymous defect, status post CVA. (Tr. 213.)

On April 3, 2006, Dr. Myers noted plaintiff to be doing very well on her current treatment regimen. Plaintiff complained of some difficulty seeing to the right. It was noted that plaintiff had not yet undergone TEE testing as previously ordered, and Dr. Myers advised plaintiff of the importance of such testing. Examination was unchanged from her previous visit, and plaintiff was continued on her current treatment regimen. (Tr. 244.)

Plaintiff underwent TEE testing on April 27, 2006, which showed mild mitral regurgitation, trace-to-mild aortic insufficiency, and trace tricuspid regurgitation, but was otherwise unremarkable. (Tr. 249-50.)

Plaintiff visited Dr. Reed on September 7, 2006, who noted plaintiff to have no new complaints. It was noted that plaintiff was looking for new employment, but was happy that she was off work during the summer so she could be free to help her family members. Plaintiff was instructed to continue with her medications and to return in six months. (Tr. 255.)

Plaintiff visited Dr. Reed on March 16, 2007, who noted plaintiff to have no new complaints. It was noted that plaintiff was not working, but plaintiff reported that she felt she needed to look after her aging mother. Plaintiff's arthritis was noted to be stable. Plaintiff reported being under some stress because her brother-in-law was dying from cancer. Dr. Reed noted plaintiff's problems to be "1) Stress reaction, 2) History of elevated alk phos, 3) History of hepatitis, 4) History of CVA with vision deficit with good recovery, 5) Hypertension, 6) History of ADD, 7) GERD, 8) Allergic rhinitis, 9) Arthritis." Dr. Reed refilled plaintiff's prescriptions for Plavix, aspirin, Paxil, Reglan, Inderal, Nexium, Singulair, Pepcid, Flonase, Ativan, and Lidex cream. (Tr. 255-56.) On April 11, Dr. Reed noted recent blood tests to show very good results. No new recommendations were made for plaintiff's treatment. (Tr. 256.)

Plaintiff returned to Dr. Reed on September 21, 2007, and reported recent chest pain and tightness in her neck. Dr. Reed noted plaintiff to make no other complaints, and her mood was good. Plaintiff was instructed to continue with her

medications and was referred for further evaluation.  (Tr. 257.)

In October and November 2007, plaintiff visited Dr. Jung H. Lee on three occasions for her complaints of chest pain.  An echocardiogram yielded essentially normal results except for possible thickened mitral valve with regurgitation and possible thickened aortic valve with insufficiency.  Plaintiff was diagnosed with stable, asymptomatic mitral valve disease, mitral regurgitation; controlled blood pressure; and dyslipidemia.  (Tr. 280-84.)

Plaintiff visited Dr. Reed on March 6, 2008, who noted plaintiff to have lost twenty pounds.  Plaintiff reported that she exercises twenty minutes, five or six days a week, by walking two miles.  Plaintiff reported having no stroke-like symptoms, and Dr. Reed noted plaintiff's mood to be good.  (Tr. 257.)  On April 11, plaintiff reported to Dr. Reed that she currently works out sixty-to-ninety minutes a day, four to five times a week, and participates in an organized fitness program at the gym.  Dr. Reed noted plaintiff to be very fit and trim.  Plaintiff was given prescriptions for Plavix, Inderal, Lipitor, Paxil, Prilosec, Reglan, aspirin, and Ativan.  Plaintiff was instructed to take over-the-counter Zyrtec, Aleve, and folate. Plaintiff was instructed to follow up in six months.  (Tr. 258-59.)

On October 6, 2008, Dr. Reed noted plaintiff to continue to exercise and diet.  No changes were made to plaintiff's treatment regimen.  (Tr. 259.)

On February 30, 2009, plaintiff reported to Dr. Reed that she experiences

shortness of breath and chest tightness when shoveling snow but is able to work out on the treadmill for twenty minutes with no symptoms. Dr. Reed noted plaintiff to continue to lose weight. Physical exam was unremarkable. Plaintiff was continued on aspirin, Plavix, Prilosec, Inderal, Lipitor, Paxil, Reglan, Ativan, and over-the-counter Zyrtec. (Tr. 259.)

In July 2009, plaintiff was diagnosed with celiac sprue after a small bowel biopsy revealed evidence of such. Plaintiff was placed on a proton pump inhibitor and a gluten-free diet. It was recommended that plaintiff undergo ultrasound testing for her complaints of gas and bloating, but plaintiff refused. (Tr. 262, 276.)

On August 20, 2009, Dr. Reed noted plaintiff to work out daily at the gym and physical examination showed plaintiff to be fit, strong, and very trim. Plaintiff was instructed to continue with her current medications. (Tr. 262.)

Plaintiff returned to Dr. Reed on November 23, 2009, and complained of leg pain associated with taking Lipitor. She reported that she stopped taking Lipitor two weeks prior and experienced decreased pain. Plaintiff also reported that she works out faithfully and experiences some lightheadedness afterward. Plaintiff was instructed to discontinue Lipitor and to continue on her other medications. (Tr. 261.) In January 2010, plaintiff was informed that blood tests showed overall good results. (Tr. 261.)

Plaintiff returned to Dr. Reed on February 25, 2010, who noted that plaintiff

no longer experienced leg pain or dizziness.  Plaintiff reported exercising an hour or more every day and feeling better overall.  It was noted that plaintiff could shovel snow without panting.  (Tr. 263-64.)

In a note dated April 7, 2010, Dr. Reed reported that plaintiff had called to advise that she was applying for disability.  Dr. Reed noted that plaintiff had been at home for the past several years caring for her mother who required supervision and physical assistance.  (Tr. 264.)[3]

Plaintiff underwent a consultative ophthalmologic examination on June 11, 2010, from which Dr. Robert D. Lewis diagnosed plaintiff with right homonymous hemianopia with generalized constriction.  (Tr. 266-68.)

Plaintiff visited Dr. Reed on June 17, 2010, for a routine examination. Plaintiff reported her recent ophthalmologic exam and further reported that she had an event three months prior whereby she awoke with distorted vision associated with the left eye.  Plaintiff reported this vision deficit to have lasted about two minutes.  Plaintiff also reported that her arthritis had become more intense, especially in the morning when her joints pop.  Plaintiff reported having stiffness in her hands and decreased grip.  Plaintiff reported that she continued to work out. Dr. Reed noted plaintiff's problems to be visual field deficit in March 2010, adult

---

[3] The record includes a letter from plaintiff to Dr. Reed dated April 3, 2010, in which she advises that she applied for disability for reasons not previously shared with Dr. Reed, including visual disturbances that limited her driving and performance of detailed work; previous diagnoses of ADHD and dyslexia; and anxiety with temper and violent outbursts.  (Tr. 252-53.)

onset diabetes mellitus, and arthritis – especially of the hands. No change in treatment was prescribed. (Tr. 309-10.)

On July 8, 2010, Dr. Thomas L. Monje conducted a vision examination that showed plaintiff's entrance visual acuities to be 20/25 of both the right and left eyes with glasses. Confrontation fields showed areas of vision forty-five degrees from fixation to the right and left for the right eye, and ten degrees to the right of fixation and forty-five degrees to the left for the left eye. No signs of diabetic retinopathy were noted. (Tr. 275.) During a visit that same date, Dr. Reed instructed plaintiff to see her neurologist. (Tr. 310.)

In a letter dated July 13, 2010, Dr. Monje summarized the recent results of plaintiff's vision examination and noted that plaintiff's vision qualified her for a driver's license with restrictions of right and left outside rearview mirrors. With respect to work-related abilities, Dr. Monje opined:

> Where her job or task requires normal peripheral vision to perform it, she would not be qualified for it.

> Because of her restricted peripheral field of view, her perception of where she is in her environment may be reduced. This may present a hazard to those close to her in certain situations.

> Karen is capable of sitting, standing, walking, carrying, handling objects, hearing, speaking, traveling and most normal day to day activities.

(Tr. 331.)

On August 3, 2010, James Spence, Ph.D., a psychological consultant with

disability determinations, completed a Psychiatric Review Technique Form in which he opined that plaintiff's mental impairments of anxiety and history of ADD were not severe in that they did not cause more than mild limitations in activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace; nor resulted in any episodes of decompensation of extended duration. (Tr. 334-44.)

On August 10, 2010, plaintiff visited Dr. James E. F. Alonso for a neurological examination, who noted plaintiff's medical history of ocular strokes and vision disturbances. Plaintiff reported her last episode to have occurred three weeks prior after she worked out and went to Wal-Mart whereupon her visual field had wavy lines across the bottom. Plaintiff also reported having occasional difficulty moving her legs while walking on the treadmill. Plaintiff reported having no pain, dizziness, or other stroke-like symptoms. Mental status examination was unremarkable. Examination of the cranial nerves showed right field decrease, bilaterally, but was otherwise intact. Motor exam was normal with full muscle strength noted throughout. Sensory exam was intact to light touch throughout. Coordination exam likewise was normal with steady gait and good heel, toe, and tandem walking. Dr. Alonso diagnosed plaintiff with history of ocular stroke with visual disturbances. Plaintiff was instructed to continue with aspirin and Plavix and to obtain MRI and MRA imaging of the head and neck.

Plaintiff was instructed to return in six months for follow up.  (Tr. 346-47.)

MRAs of the brain and carotid vessels dated August 18, 2010, yielded negative results.  (Tr. 349, 350.)  An MRI dated August 30, 2010, showed old infarcts at the posterior parietal and left occipital region without edema, mass effect, or abnormal enhancement.  Opacification of the left sphenoid was noted. (Tr. 348.)

Plaintiff returned to Dr. Reed on September 10, 2010, for follow up. Plaintiff complained of swollen and painful hands, but had no other joint-related complaints.  Dr. Reed noted plaintiff to appear fit and well "apart from [her] subjective joint complaints."  Plaintiff was instructed to return in three to four months.  (Tr. 355-56.)

Plaintiff visited Dr. C.J. Jos, a psychiatrist, on November 23, 2010, for evaluation.  It was noted that plaintiff sought this evaluation in relation to her application for disability.  Plaintiff reported her main problems to be physical in nature, including visual defects that caused problems with driving.  Plaintiff reported having no history of psychiatric hospitalizations, suicidal behavior, or psychosis but reported symptoms of obsessive-compulsive disorder in that she obsesses with ideas, needs to straighten things, and has difficulty going into public bathrooms and touching things.  Dr. Jos noted plaintiff's medical history and current treatment regimen.  Plaintiff reported taking Paxil for twelve years for

anxiety symptoms and that she takes Ativan as needed for acute anxiety attacks. Plaintiff reported that she previously took medication for adult onset ADHD but discontinued the medication after hypertension and stroke. Mental status examination was normal in all respects. Dr. Jos diagnosed plaintiff with panic attacks without agoraphobia, history of adult onset ADHD, reported history of learning disorder, and personality disorder with obsessive-compulsive symptoms. Dr. Jos assigned a Global Assessment of Functioning (GAF) score of 65.[4] Plaintiff was instructed to continue with Paxil and Ativan on an as-needed basis and to continue to have Dr. Reed prescribe the medication. No follow up appointments were made with Dr. Jos. (Tr. 352-53.)

On January 10, 2011, Dr. Reed noted that plaintiff was continuing with the disability process and that plaintiff complained of having trouble when trying to look at close work in that she must wait a period of time for her eyes to focus. Plaintiff reported that her arthritis was better and that taking over-the-counter Aleve helped. (Tr. 359-60.)

In a letter to plaintiff's counsel dated January 21, 2011, Dr. Reed summarized plaintiff's medical history, including "recently developed arthritic

---

[4] A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness." *Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34* (4th ed. 2000). A GAF score between 61 and 70 indicates some mild symptoms (*e.g.,* depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *Id.*

complaints affecting her hands[.]" Dr. Reed also addressed plaintiff's mental condition, writing,

> [S]he has a long history of anger management which I have personally witnessed when she was previously employed [at] our local hospital. She would lose control and act out in anger in markedly inappropriate situations such as in front of the CEO of the hospital.
>
> The patient still suffers with problems of anger management. In fact she wrote a long letter to my office on January 12th describing how she had become extremely angry because I entered the room for the visit one hour after the scheduled time. With that visit her [blood pressure] was elevated and she blames that in part on her extreme anger during that visit which she did manage to control.
>
> Ms. Cope would have difficulty conforming to the requirements of work activity due to her poor anger control. This would also interfere with interactions with co-workers and supervisors and the ordinary stress of a job situation.
>
> Her other medical problems are all contributing factors to her emotional state and in fact stress and her anger management would adversely affect her medical problems of hypertension, diabetes, sprue and risk of stroke. Her difficulty in maintaining attention will also interfere with her ability to function in a work situation and cooperate with co-workers and supervisors as well as to meet sitting and standing requirements in an ordinary job.

(Tr. 365.)

Plaintiff returned to Dr. Reed on June 24, 2011, and reported her arthritis to be the same. Plaintiff reported that she could not ride her bike because of pain associated with hemorrhoids. (Tr. 358-59.)

On October 10, 2011, plaintiff reported to Dr. Reed that she was under stress because a good friend had cancer. Plaintiff also expressed concern about her

mother's care if something were to happen to her.  Plaintiff reported that she

almost dropped a pot earlier in the day because of soreness in her left arm after she

had done more of a workout on an exercise machine.  Dr. Reed opined that the

episode was probably related to a pinched nerve.  (Tr. 358.)

Plaintiff underwent a consultative orthopedic evaluation on December 19,

2011, for disability determinations.  Plaintiff reported to Dr. Alan H. Morris that

she had symptoms of pain in her hands and knees when she was fifteen years of

age and was told that she had arthritis.  It was noted that no x-rays or

musculoskeletal examinations were ever performed.  Plaintiff reported that her

fingers have become crooked over the years and that she currently experienced

difficulty at times with fine activities, such as buttoning buttons and writing.

Plaintiff also complained of aching and swelling about the knees, bilateral hip pain,

and occasional low back pain.  Plaintiff reported that she can sit for one hour, stand

for forty-five minutes, walk for forty minutes, and lift up to thirty pounds.  Plaintiff

reported that she lives with her mother, is able to bathe and dress independently,

performs housekeeping chores, drives, goes grocery shopping, and cooks.  Physical

examination showed plaintiff to be able to walk fifty feet without a cane, with

normal tandem gait and no limp.  Heel and toe walking were normal.  Plaintiff was

able to squat but with complaints of right knee pain.  Plaintiff demonstrated normal

finger and hand control with dressing and undressing.  No visible deformities were

noted about the MP or IP joints of the hands.  Plaintiff could oppose the thumb to all digits and had a full and firm grip bilaterally with no evidence of muscle atrophy.  Plaintiff had full range of motion about the wrists.  Deep tendon reflexes were 3/4 bilaterally with 5/5 anterior tibial strength.  Knee examination was essentially normal, with only slightly limited range of motion noted.  Range of motion about the hips was pain-free.  Limited backward extension was noted, but plaintiff otherwise had full range of motion about the hips.  Slightly limited range of motion about the cervical and lumbar spine was noted.  X-rays of the right hip, right hand and wrist, and lumbar spine yielded negative results.  Upon conclusion of the examination, Dr. Morris diagnosed plaintiff with symptoms of early osteoarthritis of the hands, but with no abnormal objective physical findings; bilateral knee pain with no abnormal objective physical findings; bilateral hip pain with no abnormal objective physical findings; and complaints of spine pain with no abnormal objective physical findings.  (Tr. 371-76, 383-84.)

In a Medical Source Statement (MSS) completed that same date, Dr. Morris opined that plaintiff could frequently lift and carry up to ten pounds, occasionally lift and carry eleven to twenty pounds, and never lift and carry twenty-one pounds or more.  Dr. Morris opined that plaintiff could sit for one hour at one time and for a total of four hours in an eight-hour workday; stand for forty-five minutes at one time and for a total of two hours in an eight-hour workday; and walk for forty

minutes at one time and for a total of two hours in an eight-hour workday. Dr. Morris further opined that plaintiff could frequently reach, handle, finger, feel, push, and pull with her right hand and left hand, and could frequently operate foot controls with her right foot and left foot. Dr. Morris opined that plaintiff should never climb ladders or scaffolds but could occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl. Dr. Morris opined that plaintiff should never be around unprotected heights or moving mechanical parts, and should only occasionally operate a motor vehicle. No other physical limitations were noted. (Tr. 377-82.)

## IV.  The ALJ's Decision

The ALJ found that plaintiff met the insured status requirements of the Act through December 31, 2011. The ALJ found that plaintiff had not engaged in substantial gainful activity since June 13, 2006, the alleged onset date of disability. The ALJ found plaintiff's visual residuals of stroke to be a severe impairment, but that plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 12-16.) The ALJ found that plaintiff had the RFC to perform work at all exertional levels but with the following limitations:

> The claimant should not climb ropes, ladders or scaffolds, and avoid moderate exposure to moving machinery, hazardous machinery or unprotected heights. In addition, the claimant is limited to occasional interaction with the general public and contact with co-workers should

be casual and infrequent.  Finally, the claimant is limited to using
computers and/or completing paperwork for no more than four hours
of an eight-hour workday.

(Tr. 16.)  The ALJ found plaintiff unable to perform any past relevant work.

Considering plaintiff's age on the date last insured, her education, work

experience, and RFC, the ALJ determined that vocational expert testimony

supported a finding that plaintiff could perform other work existing in significant

numbers in the national economy, and specifically, small product assembler and

eye dropper assembler.  The ALJ therefore found that plaintiff was not under a

disability from June 13, 2006, through December 31, 2011, the date last insured.

(Tr. 19-21.)

## V.  Discussion

To be eligible for DIB under the Social Security Act, plaintiff must prove

that she is disabled.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001);

*Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992).

The Social Security Act defines disability as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months."  42

U.S.C. § 423(d)(1)(A).  An individual will be declared disabled "only if [her]

physical or mental impairment or impairments are of such severity that [she] is not

only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by

substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the plaintiff's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the

claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted).  The Court must also consider any evidence which fairly detracts from the Commissioner's decision.  *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).  However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole.  *Pearsall*, 274 F.3d at 1217 (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).  "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision."  *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ's RFC determination is not supported by substantial evidence on the record as a whole arguing that the ALJ improperly discredited her subjective complaints, improperly weighed the opinion evidence from Drs. Reed and Morris, and failed to order a consultative mental examination. Plaintiff contends that with such errors, the ALJ's RFC assessment did not include additional physical and mental limitations attributable to her arthritis and mental impairments.  For the following reasons, the ALJ did not err and her decision is

supported by substantial evidence on the record as a whole.

A.    Credibility Determination

Before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005).  In so doing, the ALJ must consider all evidence relating to the claimant's subjective complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted).  When rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination detailing her reasons for discrediting the testimony. *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012); *Cline v. Sullivan*, 939 F.2d 560, 565 (8th Cir. 1991).  "It is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies in the evidence presented and discuss the factors set forth in *Polaski* when making credibility determinations." *Cline*, 939 F.2d at 565; *see also Renstrom,* 680 F.3d at 1066; *Beckley v. Apfel*, 152 F.3d 1056, 1059-60 (8th Cir. 1998).  Where an ALJ explicitly considers the *Polaski* factors but then discredits a claimant's complaints for good reason, the decision should be upheld. *Hogan v.*

*Apfel*, 239 F.3d 958, 962 (8th Cir. 2001); *see also Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007). The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. *Tellez,* 403 F.3d at 957; *Pearsall*, 274 F.3d at 1218.

In her written decision here, the ALJ set out numerous, detailed inconsistencies in the record to support her determination that plaintiff's subjective complaints were not fully credible. First, the ALJ noted that plaintiff was not fully compliant with her treating sources' recommendations, noting specifically that plaintiff delayed undergoing diagnostic testing as ordered by her doctors; and indeed, the record shows that plaintiff refused recommended ultrasound testing. *E.g., Gulliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) (failure to take advantage of physician's offer to refer to specialist weighs against credibility); *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004) (subjective complaints not credible where claimant cancelled physical therapy appointments). The ALJ also noted that despite plaintiff's claim of impaired driving, she did not participate in a driving-safety evaluation as suggested by her physician.

The ALJ also noted that plaintiff had worked with her impairments prior to the alleged onset date and that the record did not show a deterioration of her functional abilities subsequent thereto. Where a claimant has worked with an impairment in the past and there is no evidence of significant deterioration, an ALJ

may find that the impairment is not disabling in the present.  *See Goff v. Barnhart*, 421 F.3d 785, 792-93 (8th Cir. 2005).  A review of the record here shows plaintiff's activities subsequent to June 2006 not to be limited in any regard.  As noted by the ALJ, plaintiff demonstrated an ability to function independently and engaged in a variety of physical and interactive activities – including caring for her elderly mother, shopping, visiting with friends and family members, playing pool, caring for pets, completing household chores, driving, and going to the gym. These activities are inconsistent with plaintiff subjective complaints of disabling impairments, including her claim of an inability to interact with others.  *See Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010) (claimant's actual activities inconsistent with claim of disability).  *E.g., Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (ability to care for son and frequently ill girlfriend, clean house, do yard work, leave the house every day, ride in a car, go out alone, shop in stores, manage finances, use a computer, plays sports occasionally, socialize and play games with friends and family, and attend religious services inconsistent with complaints of disabling pain); *Halverson*, 600 F.3d at 932 (ability to engage in self-care, care for pet, prepare meals, do laundry, clean house, drive car, run errands, go out alone, shop, manage finances, and watch television show "normal range" of daily activities).  Indeed, the undersigned notes that plaintiff shared with her treating physician on more than one occasion that she was satisfied being

unemployed so she could care for her mother.  *E.g., Eichelberger,* 390 F.3d at 590

(in discounting credibility, ALJ did not err by considering fact that claimant ceased

employment at same time she became primary caregiver to grandchild).

The ALJ also noted medical evidence to show improvement in plaintiff's

vision, with recent testing showing no major abnormalities, corrected vision of

20/25 in both eyes, and visual acuity at a level permitting qualification for a

driver's license with the only restriction being use of outside mirrors.  The ALJ

also noted objective medical evidence not to support a finding that plaintiff's

arthritis poses significant functional limitations, given physical examinations and

imaging studies that fail to show major abnormalities.  *See Ramirez v. Barnhart*,

292 F.3d 576, 581 (8th Cir. 2002) (ALJ entitled to make factual determination that

claimant's subjective complaints are not credible in light of objective medical

evidence to the contrary); *Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994)

(absence of objective medical evidence supporting subjective allegations is one

factor the ALJ is required to consider).

These reasons to discredit plaintiff's subjective complaints are supported by

substantial evidence on the record as a whole.

Accordingly, in a manner consistent with and as required by *Polaski*, the

ALJ considered plaintiff's subjective complaints on the basis of the entire record

and set out numerous inconsistencies that detracted from her credibility.  Because

the ALJ's determination not to credit plaintiff's subjective complaints is supported by good reasons and substantial evidence, the Court must defer to this determination. *Renstrom,* 680 F.3d at 1065; *Goff,* 421 F.3d at 793; *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005).

B.  Medical Opinion Evidence

Plaintiff contends that the ALJ improperly considered the medical opinions rendered by Drs. Reed and Morris, which supported additional physical and mental limitations that were not included in the RFC assessment. For the following reasons, the ALJ did not err in her consideration of this opinion evidence.

In evaluating opinion evidence, the Regulations require the ALJ to explain in the decision the weight given to any opinions from treating sources, non-treating sources, and non-examining sources. *See* 20 C.F.R. § 404.1527(e)(2)(ii). The Regulations require that more weight be given to the opinions of treating physicians than other sources. 20 C.F.R. § 404.1527(c)(2). A treating physician's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Id.; see also Forehand v. Barnhart*, 364 F.3d 984, 986 (8th Cir. 2004). This is so because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2).

When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty. 20 C.F.R. § 404.1527(c). The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion." 20 C.F.R. § 404.1527(c)(2).

The Regulations likewise require the ALJ to apply the factors set out in 20 C.F.R. § 404.1527(c) when weighing opinion evidence obtained from non-treating sources such as consulting physicians. Such opinions, however, do not generally constitute substantial evidence. *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998).

Against this backdrop, the undersigned reviews plaintiff's claims regarding

the weight accorded to Drs. Reed's and Morris's opinions rendered in this cause.

1. *Dr. Reed*

In her written decision, the ALJ accorded limited weight to Dr. Reed's January 2011 opinion that plaintiff's anger problems and difficulty maintaining attention would interfere with her ability to function in a work situation, finding this opinion to be inconsistent with plaintiff's treatment history and her own treatment notes. The ALJ did not err in this determination.

Inconsistency with substantial evidence on the record as a whole is itself an appropriate basis upon which to discount a treating physician's opinion. *Goff*, 421 F.3d at 790-91. Here, the ALJ properly noted that Dr. Reed's finding that plaintiff's mental impairment prevented her from engaging in work-related activities was inconsistent with the record evidence of plaintiff's treatment history. Other than Dr. Reed's statement in her January 2011 letter to counsel, there are no findings, observations, or recommendations for treatment from any medical source regarding plaintiff's alleged anger, attention deficit, or other mental limitations. Although in her April 2010 letter to Dr. Reed, plaintiff reported having always been in trouble because of her temper, a review of the medical evidence obtained from treating physicians, consulting physicians, and specialists shows plaintiff to have consistently exhibited normal and unremarkable behavior during mental status examinations, to have been observed to be pleasant and cooperative, and to

have consistently been observed to be in a "good mood."  Because Dr. Reed's opinion that plaintiff's mental limitations would prevent her from working is inconsistent with and unsupported by the medical evidence of record, including her own treatment notes, the ALJ did not err in according limited weight to this opinion.  *Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011); *Halverson,* 600 F.3d at 930.

      2.    *Dr. Morris*

With respect to Dr. Morris's December 2011 MSS, the ALJ determined to accord it little weight to the extent Dr. Morris opined that plaintiff was limited in lifting, walking, sitting, and standing such that she was restricted to no more than light exertional work; had postural limitations beyond the inability to climb ladders and scaffolds; had manipulative limitations; and was limited in driving.  For the following reasons, the ALJ did not err in this determination.

The ALJ found that objective medical evidence as well as plaintiff's activities of daily living were inconsistent with the above limitations and, indeed, noted that Dr. Morris's own examination of plaintiff failed to yield a basis for such limitations.  These reasons are supported by substantial evidence.  Dr. Morris's examination included diagnostic testing and clinical evaluation that showed no evidence of abnormalities.  Examination of all joints allegedly affected by arthritis yielded normal results, with range of motion noted to be only slightly limited about

the knees, hips, and spine. Examination of plaintiff's hands showed normal finger and hand control with fine manipulation, full and firm grip, full range of motion, no evidence of muscle atrophy, and no visible deformities. Despite this objective evidence of no abnormalities, Dr. Morris nevertheless imposed limitations that appear to be consistent with and based upon plaintiff's subjective statements made during the evaluation. Where a physician's opinion is largely based on a claimant's subjective complaints rather than on objective findings, an ALJ does not err in giving the opinion limited weight. *Renstrom*, 680 F.3d at 1064.

In addition, as noted by the ALJ, plaintiff's actual activities of frequently working out at a gym, regularly driving, and physically lifting her mother when assisting her are inconsistent with the exertional and physical limitations as opined by Dr. Morris. *See Goff,* 421 F.3d at 790 (ALJ properly discounted physician's opinion where claimant testified that she regularly engaged in activities that exceeded opined limitations); *Tellez,* 403 F.3d at 956 (substantial evidence supported ALJ's decision to discount physician's opinion given that claimant's actual behavior was clearly at odds with limitations described by the medical source). *Cf. Baldwin v. Barnhart*, 349 F.3d 549, 557 (2003) (exertional restrictions in RFC consistent with claimant's testimony as to such).

Finally, the ALJ noted that Dr. Morris provided no rationale or support for his opined limitations. An ALJ is permitted to accord limited weight to medical

opinion evidence in such circumstances. 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion.").

In sum, a review of the ALJ's decision shows the ALJ to have properly evaluated plaintiff's limitations in view of the opinion evidence of record and to have provided good reasons for the weight she accorded the opinion evidence. Because the ALJ's determination to accord little weight to the opinions set out in Dr. Reed's January 2011 letter and to certain of the opinions expressed in Dr. Morris's December 2011 MSS is supported by good reasons and substantial evidence, the Court defers to this determination.

Finally, contrary to plaintiff's assertion that the ALJ should have ordered a consultative mental evaluation in order to obtain opinion evidence regarding her mental impairment, the ALJ was not required to obtain additional evidence given that the existing evidence of record – including the November 2010 psychiatric evaluation – provided a sufficient basis for her decision regarding plaintiff's mental limitations. *See Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995).

C.    RFC Determination

Plaintiff claims that by improperly discounting her credibility and the opinion evidence of Drs. Reed and Morris in this cause, the ALJ failed to include additional physical and mental limitations in the RFC that are attributable to her

arthritis and mental impairments.  As discussed above, however, the ALJ properly considered and weighed the available medical evidence and plaintiff's credibility. An ALJ is not obligated to include limitations in an RFC from opinions that she properly disregarded.  *Wildman v. Astrue*, 596 F.3d 959, 969 (8th Cir. 2010).  Nor must an ALJ include in an RFC assessment claimed limitations that she finds not to be credible.  *Goff*, 421 F.3d at 793 (ALJ must assess claimant's RFC based on all relevant, credible evidence in record); *cf. Wildman*, 596 F.3d at 969 (ALJ's RFC determination influenced by finding claimant's allegations not credible).

The ALJ properly assessed plaintiff's RFC based upon all the record evidence in this cause, including medical and testimonial evidence, and the record contains some medical evidence that supports the ALJ's RFC determination. Because substantial evidence on the record as a whole supports this determination, it will not be disturbed.  *Krogmeier v. Barnhart*, 294 F.3d 1019, 1023-24 (8th Cir. 2002) (standard for RFC assessment); *Casey,* 503 F.3d at 691 (court will not disturb ALJ's decision if it falls within available "zone of choice").

## VI.  Conclusion

Accordingly, for the reasons set out above on the claims raised by plaintiff on this appeal, the ALJ's determination that plaintiff was not disabled from June 13, 2006, to December 31, 2011, is supported by substantial evidence on the record as a whole, and plaintiff's claims of error should be denied.

Therefore,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed with prejudice.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.


                    __/s/Terry I. Adelman_____
                    UNITED STATES MAGISTRATE JUDGE



Dated this _11th_ day of _September, 2014_.